STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
EUGENE DEUTSCH, DEFENDANT-APPELLANT.

Argued December 5 and 6, 1960—Decided February 6, 1961.

*Mr. Roy G. Simmons* argued the cause for the appellant
(*Messrs. Camp & Simmons,* attorneys).

*Mr. Thomas J. Muccifori,* Assistant Prosecutor, argued
the cause for the respondent (*Mr. Howard Ewart,* Ocean
County Prosecutor, attorney).

The opinion of the court was delivered by

JACOBS, J.  The defendant moved before sentencing for
leave to withdraw his plea of *non vult* to an accusation containing 28 counts and charging violations of *N. J. S.*
*2A* :111–11.  The motion was denied by County Judge Ewart
who rejected the defendant's application that he disqualify
himself and sentenced him to serve specified terms in the
State Prison and to pay stated fines.  The defendant appealed to the Appellate Division and we certified his appeal
while it was pending there.

Heller and Company, a corporation engaged in the financing and factoring business, entered into financing arrangements with Toledo Brothers, Inc. and Farmers Exchange,
Inc., corporations engaged in the egg business and with which
the defendant was actively associated.  In the course of the
financing, Heller and Company was allegedly defrauded of
very large sums of money through the use of forged schedules,
invoices, and trade acceptances.  The Monmouth County
Grand Jury returned forgery indictments against the defendant but these indictments were *nolle prossed* because
of improper venue.  On October 23, 1958 the defendant was
indicted by the Ocean County Grand Jury on six counts
charging forgery in violation of *N. J. S. 2A* :109–1.  Thereafter the defendant was indicted in the State of New York
on 28 counts of grand larceny and forgery.  Pleas of not

guilty were entered by the defendant to the Ocean County and New York indictments.

In June 1959 the defendant moved for an order specifying a trial date (*R. R.* 3:11–3(b)) and for other relief. On the return date of the motion there was evidently discussion between counsel for the defendant and the Assistant Prosecutor with respect to the entry of a plea and thereafter there was correspondence between them. On October 28, 1959 the Assistant Prosecutor advised counsel for the defendant that it was generally the policy of his office in a case involving a first offender who enters a plea "not to make any recommendation concerning jail." On November 24, 1959 counsel for the defendant indicated that his client wanted to enter a plea to charges of violating *N. J. S.* 2*A*:111–11 which provides generally that any officer or employee of a corporation who circulates or concurs in the circulation of any written statement which he knows to be false, with intent to deceive or defraud, is guilty of a misdemeanor; in contrast, violation of *N. J. S.* 2*A*:109–1 constitutes a high misdemeanor.

It was evidently the belief of the defendant's counsel that a plea of *non vult* to an accusation charging comparable violations of *N. J. S.* 2*A*:111–11 would preclude further prosecution of the New York indictment under the terms of the New York Penal Code. At the request of the Assistant Prosecutor, the defendant's counsel prepared (but *cf. R. R.* 3:4–2) the 28-count accusation in the instant matter which was a counterpart of the 28-count New York indictment. On December 1, 1959 he forwarded the accusation and expressed the view that if the court declined to follow the Assistant Prosecutor's recommendation "the defendant should have the opportunity to retract his plea and go to trial on the merits." In response to this the Assistant Prosecutor, in a letter dated December 3, 1959, stated that his office would make no recommendation on the question of jail, that is, it would "neither recommend that the defendant be sent to jail nor that the court show him leniency and

not jail him" and that "we certainly do not agree to any retraction of plea by you should the court impose a jail sentence." Thereafter, on December 7, 1959 the defendant and his counsel appeared in open court before Judge Ewart; at that time the defendant waived the reading of the 28-count accusation, executed a waiver of indictment and trial by jury which was witnessed by his counsel, executed Criminal Procedure Form 13A (see *R. R. Appendix of Forms*) which was also witnessed by his counsel, and entered a plea of *non vult*. The defendant and his counsel appeared before the Probation Department on December 7 and again on December 17 in connection with the presentence investigation. See *R. R.* 3:7–10(b). Sentencing was originally scheduled for December 22, 1959 but was adjourned to January 8, 1960; in the meantime, on January 5, 1960, the defendant served notice that he would move before Judge Ewart for an order permitting him to retract his plea of *non vult* and to enter a plea of not guilty. See *R. R.* 3:7–10(a).

On January 8, 1960 counsel for the defendant appeared with his client before Judge Ewart and argued in support of the motion for leave to withdraw the plea of *non vult.* He stated that his client had advised him prior to December 7, 1959 that he was innocent and that he was still asserting his innocence; that because of other engagements he had little opportunity to confer with his client before their appearance in court on December 7, 1959; and that there would be no prejudice to the State if the plea were permitted to be withdrawn and the matter proceeded to trial. In opposing the motion the Assistant Prosecutor referred to the negotiations which he had with counsel for the defendant over a long period of time and stressed that during his court appearance on December 7, 1959 the defendant had acknowledged that he understood the nature of the charges against him, that he had voluntarily signed the waiver of indictment and trial by jury, and that he was aware of the fact that "in the eyes of the law" his plea of *non vult* "is equivalent to a plea of guilty." *Cf. Kravis v. Hock,*

136 *N. J. L.* 161, 165 (*E. & A.* 1947) ; *State v. Pometti,* 12 *N. J.* 446, 453 (1953). No affidavits or documents, other than a legal brief, were then submitted in support of the motion but the defendant was called to testify and stated in response to direct questions from his own counsel that he was innocent and that he believed that there should be a trial in which he thought he could "prove" his innocence.

On cross-examination the defendant testified that he was a certified public accountant and that during his court appearance on December 7, 1959 he understood the nature of the charges and had pleaded *non vult* which he understands to amount to "no contest." He suggested that he was "confused" and that his counsel had not "gone through all of these papers" with him but had told him to sign them and "that we would go over the papers later." He also referred to the fact that he is a diabetic and was under medical care at the time the plea of *non vult* was entered. At the close of the testimony, Judge Ewart indicated his belief that the defendant had understood the nature of the accusation and his plea and expressed the thought that the defendant's counsel should be given an opportunity to meet his client's charge that without explanation he was told to sign the various papers and that they would go over them later. In response to this, counsel for the defendant repeated that he had little opportunity to talk with his client on December 7, 1959 and that he had told him that "after the proceedings I would explain it more in detail to him." Judge Ewart then asked whether counsel had anything further to say or whether he would like to submit "any additional briefs on this." Counsel responded that he would and the Judge reserved decision stating that he would allow two weeks and then file his opinion.

No further briefs were filed but on January 18, 1960 the defendant filed an affidavit in support of his application for leave to withdraw his plea of *non vult*. In this affidavit he repeated his claim of innocence in general terms adding, however, general statements that the invoices were not in

his handwriting, that the trade acceptances were not typed by him, and that the schedules were not in his handwriting or signed by him. On the same day the defendant filed another affidavit which stated that he now finds that Judge Ewart is a brother of Prosecutor Ewart, that Prosecutor Ewart is a law partner of the Assistant Prosecutor handling the matter, and that he desires that the application for leave to withdraw his plea be considered by a judge other than Judge Ewart. An affidavit in opposition to the defendant's motions was filed by the Assistant Prosecutor on January 20, 1960. On February 5, 1960 Judge Ewart rendered his opinion in which he determined that the defendant had made his plea "deliberately and understandingly, without coercion or undue pressure" and that his application for leave to withdraw, which he found to be "a mere maneuver to postpone the day of reckoning," should accordingly be denied. An order to that effect was entered on February 9, 1960 and on February 11, 1960 an order was entered denying the motion to disqualify. Thereafter judgment of conviction was entered on the plea of *non vult,* the defendant was sentenced, and the appeal now under consideration was duly taken.

Although some states permit the withdrawal of guilty (or *non vult* and *nolo contendere*) pleas as of right at any time before sentence (see 22 *C. J. S. Criminal Law* § 421, *p.* 645 (1940)), New Jersey adheres to the widely prevailing rule that once the plea has been entered it may not be withdrawn except pursuant to leave granted in the exercise of the court's discretion. See *State v. Pometti, supra,* 12 *N. J.,* at *p.* 452; *Clark v. State,* 57 *N. J. L.* 489, 490 (*Sup. Ct.* 1895), affirmed 58 *N. J. L.* 383 (*E. & A.* 1895); *cf. R. R.* 3:7–10(a); Notes, 64 *Yale L. J.* 590 (1955); 55 *Colum. L. Rev.* 366 (1955); 35 *N. Y. U. L. Rev.* 284 (1960). See also *Orfield, Criminal Procedure from Arrest to Appeal* 300 (1947); 4 *Wharton's Criminal Law and Procedure* § 1908 (*Anderson's ed.* 1957). In exercising its discretion the court must fairly and justly weigh the policy

considerations which favor the finality of judicial procedures against the policy considerations which dictate that no man be deprived of his life or liberty except upon conviction after a fair trial or after the entry of a plea of guilty or its equivalent under circumstances which evidence that it was made truthfully, voluntarily and understandingly. Compare *State v. Pometti, supra,* 12 *N. J.,* at *p.* 453 with *State v. Reali,* 26 *N. J.* 222, 224 (1958). See *State v. Gailes,* 64 *N. J. Super.* 232, 239 (*App. Div.* 1960); *United States v. Lester,* 247 *F.* 2d 496, 501 (2 *Cir.* 1957); *Roberto v. United States,* 60 *F.* 2d 774, 775 (7 *Cir.* 1932).

██ Where the application to withdraw the plea is first made after sentence the courts in our State, in practice, generally decline to interfere in the absence of a strict showing by the applicant that there was manifest injustice which requires correction through vacation of the conviction and the granting of a new trial. See *R. R.* 3:7–10(a); *State v. Schrier,* 30 *N. J.* 241, 243 (1959); *State v. Gailes, supra,* 64 *N. J. Super.,* at *p.* 241; *State v. Torzillo,* 61 *N. J. Super.* 253, 260 (*App. Div.* 1960); *State v. Oats,* 32 *N. J. Super.* 435, 442 (*App. Div.* 1954); *State v. Nicastro,* 41 *N. J. Super.* 484, 488 (*Cty. Ct.* 1956). However, where before sentence the defendant asserts his innocence and seeks to withdraw his plea and proceed to trial, the courts in our State, in practice, generally exercise their discretion liberally to enable withdrawal of the plea and a trial on the merits; this approach conforms with the enlightened views expressed in many judicial opinions elsewhere. See *Gearhart v. United States,* 106 *U. S. App. D. C.* 270, 272 *F.* 2d 499, 502 (*D. C. Cir.* 1959); *Poole v. United States,* 102 *U. S. App. D. C.* 71, 250 *F.* 2d 396, 400 (*D. C. Cir.* 1957); cf. *Bergen v. United States,* 145 *F.* 2d 181, 187 (8 *Cir.* 1944); *People v. Young,* 138 *Cal. App.* 2d 425, 291 *P.* 2d 980 (*D. C. App.* 1956); *State v. McBane,* 128 *Mont.* 369, 275 *P.* 2d 218 (*Sup. Ct.* 1954); *Pittman v. State,* 198 *Miss.* 797, 23 *So.* 2d 685 (*Sup. Ct.* 1945); *Krolage v. People,* 224 *Ill.* 456, 79 *N. E.* 570 (*Sup. Ct.* 1906); 14 *Am. Jur.* 963 (1938).

In *Poole v. United States, supra,* the defendant, appearing without counsel, entered a plea of guilty. Thereafter counsel was appointed and on the day of sentencing the defendant notified him that he wished to withdraw his plea and proceed to trial. The District Court refused to permit this and sentenced the defendant to a term in prison. On appeal, its action was reversed in an opinion which noted that while an accused who moves to withdraw his plea after sentence is faced with the "formidable barrier of having to show that his conviction was manifestly unjust," an accused who makes his motion before sentencing is ordinarily entitled to the benefit of the rule that such leave is to be "freely allowed." 250 *F. 2d,* at *p.* 400. In *Gearhart v. United States, supra,* the defendant, while represented by assigned counsel, signed a waiver of indictment and entered a plea of guilty. Prior to sentencing he moved to withdraw his plea on the ground that he was not mentally responsible at the time of the alleged offense. The District Court, relying on *United States v. Miller,* 254 *F. 2d* 523 (2 *Cir.* 1958), refused to allow the withdrawal of the plea and imposed sentence. This was reversed on appeal in an opinion which had this to say:

"We believe that the District Court's reliance on the *Miller* case was not well taken. There, the defendant moved to withdraw his plea after sentence had been imposed. In such circumstances, the 'court * * * may set aside the judgment of conviction and permit the defendant to withdraw his plea' when necessary in order 'to correct manifest injustice.' *Fed. R. Crim. P.* 32(d), 18 *U. S. C.* When, however, as here, the motion to withdraw the plea is made before sentence is imposed, this court has interpreted the first clause of Rule 32(d) to set a more lenient standard. Where a guilty plea had been received from a defendant appearing without counsel, we said: 'Leave to withdraw a guilty plea prior to sentencing should be freely allowed.' *Poole v. United States,* 1957, 102 *U. S. App. D. C.* 71, 75, 250 *F. 2d* 396, 400. And the Supreme Court in broad *dictum* already had said that 'The court in exercise of its discretion will permit one accused to substitute a plea of not guilty and have a trial if for *any reason* the granting of the privilege seems *fair and just.'* (Emphasis added.) *Kercheval v. United*

*States*, 1927, 274 *U. S.* 220, 224, 47 *S. Ct.* 582, 583, 71 *L. Ed.* 1009. These principles, we think, are controlling here." 272 *F. 2d*, at *p.* 502.

█ Our Court Rule numbered *R. R.* 3:7–10(a) is taken from and is substantially identical with Federal Criminal Rule 32(d), 18 *U. S. C. A.;* it provides that a motion to withdraw a plea of guilty or *nolo contendere* or *non vult* may be made only before sentence is imposed or suspended but that to correct manifest injustice the court may after sentence set aside the judgment of conviction and permit the withdrawal of the plea. In *State v. Pometti, supra,* 12 *N. J.* 446, the defendant entered pleas of not guilty to three indictments and was found guilty after a trial of one of the indictments. Thereafter, he was given permission to withdraw his pleas of not guilty to the untried indictments and to enter pleas of *nolo contendere.* On the day fixed for sentencing he was refused assurances that he would be sentenced on all three indictments as for one offense and he thereupon requested permission to withdraw his pleas of *nolo contendere* to the two untried indictments. His application was denied and he was sentenced on the three indictments to serve consecutive prison terms. On appeal, this court affirmed the lower court's action. It held that *Rule* 2:7–10(e) —the predecessor to *R. R.* 3:7–10(a)—did not alter the rule in New Jersey that a motion to withdraw a plea, even though made before sentence, is addressed to "sound judicial discretion, to serve the ends of essential justice"; and it observed that the pleas of *nolo contendere* were made "deliberately and understandingly, without coercion or undue pressure" and that "there was no intimation, not even the faintest, of a defense on the merits." 12 *N. J.,* at *pp.* 452, 453. Although the court found that the particular circumstances before it did not warrant any interference with the lower court's exercise of its discretion, it said nothing to cast doubt on the soundness or justness of the pre-existing practice in our State favoring liberal discretionary grants of presentence applications for withdrawal of pleas.

Our Court Rules contain explicit provisions which are designed to protect against the improper entry of pleas of guilty, *non vult* and *nolo contendere*. Thus *R. R.* 3:5–2(a), which is a counterpart of Rule 11 of the Federal Rules of Criminal Procedure, provides that the court shall not accept the plea without first determining that it "is made voluntarily with understanding of the nature of the charge"; and *R. R.* 3:5–2(b) provides that before the plea is accepted the court shall require the defendant to complete Criminal Procedure Form No. 13A which embodies questions designed to ascertain, *inter alia,* that the defendant understands the charge against him and knows that upon the entry of the plea, the trial judge may impose such sentence as he considers appropriate "subject to the limits prescribed by law." On a later application to withdraw the plea, the execution of Form 13A will, of course, weigh heavily against a contention that the plea was not entered voluntarily and understandingly but it is by no means conclusive; in exercising its discretion, the court will carefully consider and evaluate not only the submitted materials bearing on the manner of the entry of the plea but also the submitted materials bearing on the related pertinent issues such as guilt of the defendant and prejudice to the State. See *Hubble v. State,* 41 *Wyo.* 275, 285 *P.* 153 (*Sup. Ct.* 1930); *McAtee v. State,* 39 *Okl. Cr.* 10, 262 *P.* 703 (*Cr. Ct. App.* 1928); *cf. Briscoe v. United States,* 102 *U. S. App. D. C.* 145, 251 *F. 2d* 386 (*D. C. Cir.* 1958); *People v. Wexner,* 280 *Mich.* 696, 274 *N. W.* 371 (*Sup. Ct.* 1937). See also *State v. Pometti, supra,* 12 *N. J.,* at *p.* 453; *State v. Gailes, supra,* 64 *N. J. Super.,* at *p.* 239.

In *Hubble v. State, supra,* the defendant was charged with larceny in September 1926 and entered a plea of guilty in October 1926. He was released on condition that he leave and remain out of the state. He returned to the state in 1929, was arrested and prior to sentence sought to withdraw his plea of guilty. His application was denied and he was sentenced to a term in the penitentiary. On appeal, the

Supreme Court of Wyoming acknowledged that generally the court's discretion is to be "exercised liberally in favor of life and liberty" (285 *P.*, at *p.* 155) and that withdrawal of the plea is to be permitted whenever this action will subserve the "ends of justice" (285 *P.*, at *p.* 156); it nevertheless sustained the trial court's action noting that the plea was made voluntarily, that the court had no "serious doubt of the defendant's guilt" (285 *P.*, at *p.* 155) and that it was "probably justified" in believing that the state was prejudiced by occurrences during the long time lapse between the entry of the plea of guilty and the application for withdrawal. 285 *P.*, at *p.* 156. *Cf. Clark v. State, supra,* 57 *N. J. L.,* at *p.* 490. In the course of his opinion for the court, Chief Justice Blume expressed the view that if the trial court had any serious doubt as to the defendant's guilt "it would have been its duty to have permitted the plea of guilty to be withdrawn." 285 *P.*, at *p.* 155.

In *McAtee v. State, supra,* the Criminal Court of Appeals of Oklahoma declined to upset the lower court's discretionary denial of the defendant's presentence application for withdrawal of his plea of guilty; it observed that although the application to withdraw set forth that the defendant believed that he had a good defense, it failed to allege "any state of facts that would show a defense"; and it found nothing in the record to indicate that the "interests of justice" required a reversal of the conviction entered pursuant to the plea of guilty. 262 *P.*, at *p.* 705. In *State v. Pometti, supra,* this court declined to upset the trial court's discretionary denial of the defendant's presentence application for withdrawal of his pleas of *nolo contendere;* in the course of Justice Heher's opinion he significantly referred to the fact that there had been no intimation that the defendant had any defense on the merits. See *State v. Gailes, supra,* 64 *N. J. Super.,* at *p.* 239. In *Gearhart v. United States, supra,* the United States Court of Appeals for the District of Columbia held that upon the record before it the trial court should have granted the defendant's presentence applica-

tion for leave to withdraw his plea of guilty; in the course of its opinion it indicated that although the trial court was in no sense called upon to decide the ultimate merits of the defendant's proffered defense of insanity it might have been justified in conducting a preliminary hearing if the government had urged that the defendant's proffered defense was "patently frivolous." 272 *F. 2d,* at *p.* 503. See *Briscoe v. United States, supra,* 251 *F. 2d,* at *p.* 387; *cf. Bergen v. United States, supra,* 145 *F. 2d,* at *p.* 187.

The defendant Deutsch acknowledged that he had· been interrogated in open court on the day of his plea and that he had executed Form 13A along with the waiver of indictment and trial by jury but nevertheless urged that he was confused and that his counsel had neglected to explain the individual documents to him. His counsel did not testify but did state briefly that he had little opportunity to talk to his client on the day of the plea and that he had told him that he would later explain the matter "more in detail." Unfortunately there was no interrogation of the defendant or his counsel with respect to their relevant discussions prior to the day of the entry of the plea. It must be borne in mind that there had been protracted negotiations between the Assistant Prosecutor and defense counsel, that the Assistant Prosecutor had followed the extraordinary course of permitting defense counsel to draw the accusation, and that it would normally be inferred that, on due occasions, defense counsel had fully advised his client of the nature of the charges in the accusation and the effect of the plea of *non vult.* In the light of all of the foregoing, the defendant and his counsel could fairly have been called upon by the trial court to present further testimony not only with respect to the events on the day of the plea but also with respect to the pertinent prior events.

On the limited record submitted to the trial court, there was ample basis for its finding that the plea of *non vult* was entered "deliberately and understandingly, without coercion or undue pressure." But so far as its opinion discloses

it confined its attention strictly to that issue; nowhere in its opinion was there any express reference to and evaluation of other pertinent issues such as guilt and prejudice nor was there any express reference to and evaluation of the fact that the application for withdrawal was made prior to sentence although after the Probation Department's investigation. The defendant stated that he was innocent and added in general terms that the invoices were not in his handwriting, that the trade acceptances were not typed by him and that the schedules were not in his handwriting or signed by him. But the accusation charged in effect that he had circulated or concurred in the circulation (*N. J. S.* 2*A* :111–11) of forged schedules, invoices and trade acceptances with intent to defraud and this charge was not at all met by his statement that the documents were not actually written, signed or typed by him. It may well be that defense counsel did not fully appreciate the burden that was his on the motion and the trial court might well have directed to the defendant's attention the insufficiency of his statement and afforded to him an opportunity to embody in the record further explanatory evidence supporting his position that he was in good faith asserting a defense on the merits. Finally, the State did not assert prejudice and in the absence of such assertion the trial court could fairly have assumed that there were no occurrences adversely affecting further prosecution of the various criminal proceedings pending in New York and New Jersey, if that course became necessary or desirable in the public interest.

It appears to us that in view of all of the foregoing, the interests of justice will best be served by affording leave to the parties to supplement the record and leave to the defendant to renew his application on the basis of the record as supplemented. We come therefore to the remaining issue presented by the defendant. After his motion to withdraw his plea had been argued, but before it was decided, the defendant filed an affidavit which read as follows:

"1. There seems to be considerable hysteria on the part of the Prosecutor in not allowing me the benefit of my day in Court. In addition I now find that Judge John Ewart, who has heard my plea, is the brother of Prosecutor Howard Ewart. Under these circumstances I must insist that my change of plea be heard by another Judge. In addition, I find there is a law firm in Ocean County known as Ewart, Lomell & Muccifori, which law firm consists of the Prosecutor, Howard Ewart, and Assistant Prosecutor, Thomas J. Muccifori, who demands that I be sentenced immediately and not be allowed to have a jury trial to establish my innocence.

2. While my attorney, Mr. Juska, has informed me that these are all men of integrity and honor, I have too much at stake, and in my opinion there is too much hysteria in not allowing me a trial before a jury to take any gamble with my freedom. I have insisted that Mr. Juska immediately file the necessary papers in order that I be heard by another Judge."

On the basis of this affidavit, the defendant moved that Judge Ewart disqualify himself but the motion was denied in an opinion holding that *N. J. S.* 2A:15–49 (see *Sebolt v. National Bank of N. J.*, 140 *N. J. Eq.* 440, 443 (*E. & A.* 1947)), which provides in part that no judge shall sit in a cause when he "is related in the third degree to any of the parties to the action," was inapplicable since, although the Prosecutor was admittedly related to the Judge within the statutory degree (*Township Committee of Freehold Tp. v. Gelber,* 26 *N. J. Super.* 388, 392 (*App. Div.* 1953)), he was not a party to the action but was counsel for a party. The trial court did not reject the motion as untimely (*Curtis v. Joyce,* 90 *N. J. L.* 47 (*Sup. Ct.* 1917), affirmed 91 *N. J. L.* 685 (*E. & A.* 1918)) and, in view of that fact and the public nature of the issue, we shall pass by the State's contention that it was unduly delayed. *Cf. City of Newark v. Pulverman,* 12 *N. J.* 105, 108 (1953). The trial court's rather narrow construction of the statute finds support in some, but by no means all, of the decisions elsewhere dealing with comparable enactments. See *Casmento v. Barlow Bros. Co.,* 83 *Conn.* 180, 76 *A.* 361 (*Sup. Ct. Err.* 1910); *Johnson v. Moore,* 109 *Vt.* 282, 196 *A.* 246 (*Sup. Ct.* 1938); Annotation, *Relationship to attorney as*

*disqualifying judge,* 50 *A. L. R. 2d* 143 (1956); Note, "Disqualification of Judge for Relationship to Attorney," 21 *Texas L. Rev.* 790 (1943); Editorial, "Disqualification of Judges," 71 *N. J. L. J.* 68 (1948). However, we shall not pursue the inquiry as to the scope of the statute since we are satisfied that it is not exclusive and that the important disqualification issue before us will be dealt with best by the discharge of our constitutional responsibility for the application of sound general principles of judicial administration. See *Const.* 1947, *Art.* 6, § 2, *par.* 3; *cf. James v. State of New Jersey,* 56 *N. J. Super.* 213, 218 (*App. Div.* 1959); *State v. Muraski,* 6 *N. J. Super.* 36, 38 (*App. Div.* 1949); *State (Stoll, Pros.) v. Overseer of Poor of Walpack Tp.,* 38 *N. J. L.* 200, 202 (*Sup. Ct.* 1875); but *cf. Clawans v. Waugh,* 10 *N. J. Super.* 605, 612 (*Cty. D. Ct.* 1950).

It is vital that justice be administered not only with a balance that is clear and true but also with such eminently fair procedures that the litigants and the public will always have confidence that it is being so administered. See Frankfurter, J. in *Offutt v. United States,* 348 *U. S.* 11, 14, 75 *S. Ct.* 11, 13, 99 *L. Ed.* 11, 16 (1954): "justice must satisfy the appearance of justice." To that end judges must refrain from engaging in any conduct which may be hurtful to the judicial system or from sitting in any causes where their objectivity and impartiality may fairly be brought into question. While the earlier common law cases in England took a narrower approach, the more recent English decisions have suggested that where the circumstances are such as to create in the mind of a reasonable man a suspicion of bias there may well be a basis for disqualification though "in fact no bias exists." See *Law v. Chartered Institute of Patent Agents,* [1919] 2 *Ch.* 276, 289. Similarly in the United States there is a significant trend, stimulated by high-minded judicial expressions as well as broad constitutional and statutory provisions, towards recognition of a basis for disqualification where, in the eyes of

the litigants and the public, the circumstances call justly for the judge's withdrawal. See *James v. State of New Jersey, supra,* 56 *N. J. Super.,* at *p.* 218; *State v. Muraski, supra,* 6 *N. J. Super.,* at *p.* 38; *Cotulla State Bank v. Herron,* 202 *S. W.* 797 (*Tex. Civ. App.* 1918); *State ex rel. Bennett v. Childers,* 188 *Okl.* 14, 105 *P.* 2d 762 (*Sup. Ct.* 1940); *State v. Miller,* 232 *La.* 541, 94 *So.* 2d 661 (*Sup. Ct.* 1957); *East Maine Township Com. Ass'n. v. Pioneer T. & S. Bank,* 15 *Ill. App.* 2d 250, 145 *N. E.* 2d 777 (*Ill. App.* 1957); *cf.* Schwartz, "Disqualification for Bias in the Federal District Courts," 11 *U. Pitt. L. Rev.* 415 (1950); Frank, "Disqualification of Judges," 56 *Yale L. J.* 605 (1947); 30A *Am. Jur., Judges* § 89 *et seq.* (1958).

In *State v. Muraski, supra,* the Appellate Division held that a magistrate should have disqualified himself in a case where the defendant was accused of driving while under the influence of liquor; the evidence indicated that while the magistrate was crossing the street the defendant had narrowly avoided striking him and that the magistrate and a police officer had thereafter taken the defendant to a doctor for examination. In the course of his opinion Judge Colie had this to say:

"The general principle with regard to disqualification of a judge is well stated in 30 *Am. Jur., 'Judges,' par.* 53: 'Next in importance to the duty of rendering a righteous judgment is that of doing it in such a manner as will beget no suspicion of the fairness and integrity of the judge. * * * Every litigant, including the state, in criminal cases, is entitled to nothing less than the cold neutrality of an impartial judge, and the law intends that no judge shall preside in a case in which he is not wholly free, disinterested, impartial and independent.' For the magistrate to have sat in judgment in the present case, in view of the aforementioned circumstances, was an unnecessary act on his part, tending to impair the confidence in and respect of the people for the courts. It is important to bear in mind that this is not a case in which the defendant would have gone untried for want of a tribunal. *R. S.* 39:5–3 specifically guards against that eventuality." 6 *N. J. Super.,* at *p.* 38.

In *State ex rel. Bennett v. Childers, supra,* the Supreme Court of Oklahoma held that the district judge should have disqualified himself in cases in which his son was the attorney for the plaintiffs; in the course of his opinion Justice Hurst said:

"The proper administration of justice, and respect for the courts, depend not only upon the intrinsic integrity, fairness and impartiality of the judges, but upon their reputation therefor in the communities in which they serve. Not only is it their duty to decide and adjudge the rights of litigants honestly, fairly and impartially, but it is also their duty to scrupulously refrain from sitting in any case, or under any circumstances, which might reasonably tend to give rise to doubt or suspicion as to their complete disinterestedness." 105 *P. 2d,* at *p.* 763

See also *Colulla State Bank v. Herron, supra,* where the court held that doubts should be decided in favor of disqualification rather than against it, pointing out that "an independent, unbiased, disinterested, fearless judiciary is one of the bulwarks of American liberty, and nothing should be suffered to exist that would cast a doubt or shadow of suspicion upon its fairness and integrity." 202 *S. W.,* at *p.* 798.

In *East Maine Township Com. Ass'n. v. Pioneer T. & S. Bank, supra,* 15 *Ill. App.* 2d 250, 145 *N. E.* 2d 777, the Appellate Court of Illinois held that the trial judge should have disqualified himself (upon the application of a petitioner who sought leave to intervene) where it appeared that the judge's son was originally the attorney for the plaintiffs and was later replaced by the judge's son-in-law. In the course of its opinion, the court quoted approvingly from a comprehensive legal annotation which referred to the recent recognition by the judiciary, bar associations and legislatures of the fact that "human frailty is not always overcome by trained judicial habits of impartiality" and that the human limitations of a trial judge resulting from his special relationship with one of the attorneys may result in the deprivation of a just hearing; and it concluded

with the following remark which is particularly pertinent here:

"It is imperative we maintain the confidence of the public in our system of justice. In this jurisdiction, where many other judges were available and could have heard the instant application for leave to intervene, the trial judge, under the circumstances presented in the instant case, should have disqualified himself and transferred the case for reassignment to another judge." 145 *N. E. 2d*, at *p.* 783

See also *Wiedemann v. Wiedemann*, 228 *Minn.* 174, 36 *N. W. 2d* 810, 812 (1949) where Justice Matson, speaking for the Supreme Court of Minnesota, expressed the thought that "no judge, when other judges are available, ought ever to try the cause of any citizen, even though he be entirely free from bias in fact, if circumstances have arisen which give a *bona fide* appearance of bias to litigants."

Those who drafted and originally implemented the Judicial Article of our 1947 *Constitution* were well aware of the need for the maintenance of the purity of the judiciary and the avoidance of conduct which might tempt or undermine judicial objectivity and impartiality or impair and lessen the confidence of litigants and the public. Thus they unequivocally prohibited members of the Supreme and Superior Courts from engaging in other gainful pursuits (*Const., Art.* 6, § 6, *par.* 6); they strictly subjected members of all the courts to the *Canons of Judicial Ethics,* including *Canon* 13 which provides that a judge shall not act in a controversy "where a near relative is a party" and shall not "suffer his conduct to justify the impression that any person can improperly influence him or unduly enjoy his favor, or that he is affected by the kinship, rank, position or influence of any party or other person"; and they severely restricted the legal activities and court appearances of any attorneys employed by or associated with members of the judiciary. See *R. R.* 1:26. Although they did not adopt a formal Rule directing that no judge shall sit in a cause in which a near relative is of counsel there is no reason to doubt that they

confidently expected that when any such situation arose the cause would be remitted to another judge under the broad transferability authority which they provided. See *Const.*, *Art.* 6, § 7, *par.* 2; *Art.* 11, § 4, *par.* 5; *R. R.* 1:29; *cf. East Maine Township Com. Ass'n. v. Pioneer T. & S. Bank, supra,* 145 *N. E. 2d,* at *p.* 783; *Wiedemann v. Wiedemann, supra,* 36 *N. W. 2d,* at *p.* 812.

Professor Frank in his article on the "Disqualification of Judges," *supra,* 56 *Yale L. J.* 605, referred to the likelihood that special attorney-judge relationships would increasingly be considered as grounds for disqualification particularly in states where cases may conveniently be transferred to other judges. He cited an opinion by the American Bar Association's Committee on Judicial Ethics to the effect that it would be "wise" for a judge to withdraw when counsel is a relative (26 *ABAJ* 234 (1940)), opinions by the New York County Lawyers Association and the Association of the Bar of the City of New York to the effect that it would be "improper" for a judge to sit when counsel is a near relative (*Opinions on Professional Ethics* 245, 738 (1956)) and a resolution adopted by the Judicial Conference of Circuit Judges to the effect that federal judges should avoid sitting in all cases in which near relatives are of counsel since such sitting would be "contrary to the spirit of Canon 13." 28 *ABAJ* 820 (1942). The Bar Association opinions and the Judicial Conference resolution quite soundly do not suggest any distinction between instances where counsel is appearing for a private litigant and those where he is appearing for the government or a governmental agency; nor do the practical precedents cited by Professor Frank suggest any such distinction—see, for example, his reference to Judge Clark's practice of not sitting in Department of Justice tax cases while his brother was Assistant Attorney General in charge of the Tax Division. 56 *Yale L. J.,* at *pp.* 618–619, *fn.* 55. Members of the present New Jersey Supreme Court have disqualified themselves whenever a close relative such as a brother or son was of counsel

and they have followed the same wholesome course in instances where the close relative was a law partner of counsel appearing for a private or public litigant.[1]  *Cf. R. R.* 1:26–7; *State v. Miller, supra,* 94 *So. 2d,* at *p.* 662.  It may be noted that they have extended their practice of withdrawal to cases where counsel, though unrelated by blood or affinity, was once a close associate such as a former law partner. See Frank, "Disqualification of Judges," *supra,* 56 *Yale L. J.,* at *p.* 630; *cf. Drinker, Legal Ethics* 72 (1953).

In fulfillment of the foregoing a comprehensive Rule on the subject of disqualification will be drafted by the Court and distributed through the office of the Administrative Director.  The Rule will have no effect on earlier cases which have been completed without suggestion of disqualification; those cases are, of course, not subject to attack.  Here, for the reasons expressed earlier in this opinion, the parties have leave to supplement the record and the defendant has leave to renew his application on the basis of the record as supplemented.  The renewed application should be heard at an early date by the Assignment Judge in the vicinage or by such other qualified trial judge as he may designate; to that end the judgment is

Reversed and the cause is remanded for further proceedings in conformity with this opinion.

*For reversal and remandment*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, SCHETTINO and HANEMAN—6.

*For affirmance*—Justice HALL—1.

---

[1] In *Spagnuolo v. Bonnet,* 16 *N. J.* 546 (1954), Chief Justice Vanderbilt disqualified himself in a case where Mr. Marshall Crowley, who was then County Counsel and a law partner of the Chief Justice's sons, appeared as counsel for the County of Essex, the County Treasurer and Sheriff.  In *Essex County v. Hindenlang,* 24 *N. J.* 517 (1957), he again disqualified himself in a case where Mr. Crowley appeared in his capacity as County Counsel for the County of Essex.  The Chief Justice did not sit on the argument and died before the case was decided.